UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MATTHEW LEE, a resident of Ada County,<br><br>  Plaintiff,<br><br>   v.<br><br>KAYSE STONE, an individual, TERRY LAKEY, an individual, ADA COUNTY, an Idaho county, CITY OF BOISE, an Idaho municipality, and ZANE STONE, an individual,<br><br>  Defendants. | Case No. 1:20-cv-00186-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Defendants Kayse and Zane Stone's Motion for Summary Judgment (Dkt. 93). For the reasons explained below, the Court will grant the motion as to plaintiff's false-arrest claim and deny the motion as to the defamation claim.

## FACTS

On April 19, 2018, Deputy Terry Lakey of the Ada County Sherriff's Office arrested Plaintiff Matthew Lee for misdemeanor second-degree stalking. The alleged victims were Kayse and Zane Stone and their 12-year-old daughter. At the

time, Kayse was an officer with the Boise Police Department. The county prosecutor eventually dismissed the charges against Lee, and Lee then brought this action against the Stones, the City of Boise, Deputy Lakey, and Ada County. Earlier, this Court dismissed all of Lee's claims except for his third and fifth claims. The third claim, which is brought under 42 U.S.C. § 1983, alleges that Kayse Stone violated Lee's Fourth Amendment rights, based on an underlying allegation that he was wrongfully arrested. The fifth claim alleges that Zane Stone defamed Lee.

## A. The Stones' Report to Law Enforcement

Before arresting Lee, Deputy Lakey collected factual statements from the Stones. *See Lakey Aff.*, Dkt. 49-2, ¶ 4, *Exs. A and B thereto*. Within these statements, the Stones conveyed the following information:

Beginning in April 2017, Kayse and Zane noticed that a black passenger vehicle began parking outside their home on multiple occasions. They also observed that the same car parked in front of their young daughter's school bus stop several times. Mr. Stone said the car windows had a "limousine tint," and both Stones noted that the license plates were completely or partially covered, such that they were unable to read them. Kayse said the person driving the car would typically sit there for 15 to 30 minutes before driving off. As she put it, "He would usually wait to drive off until he saw one of us in the window or at the front door."

*Ex. A to Lakey Aff.*, Dkt. 49-2, at 5.

Both Kayse and Zane indicated that in early April 2017, the person driving this vehicle came onto their property and he seemed to be trying to figure out the electronic codes on the garage and front doors. When they confronted him, he said he was selling extermination products, but they did not observe him approaching any of their neighbors' homes. Kayse also provided a description of the person. She described him as a "white male adult in his late 30's, approximately 6' to 6'6", 170-190 lbs and … bald/clean shaven." *Ex. A to Lakey Aff*, Dkt. 49-2.

Kayse indicated that they stopped seeing this person around September 2017, and they thought the problem had resolved. But they began seeing the same vehicle in front of their home again beginning in early April 2018. They were initially unable to get a plate number, but that changed on April 16, 2018. On that evening, Zane noticed the same black Honda Accord had once again pulled up outside his home. He was sitting in the living room, and when got up to take a picture, the car drove off. This time, however, Zane got into his truck and followed the car. He said that as he rounded a corner, he noticed the driver had pulled over and was outside the vehicle, "adjusting the bike rack on the rear of his vehicle to make sure it was covering the plate." *Id.* Zane said that upon seeing this person, he immediately recognized him as the man he had seen at his home in the past. He described the driver as being around 6'2", weighing less than 200 pounds, and with

a shaved or bald head. Zane followed the vehicle and was eventually able to get the plate number by reading "the very top" of the numbers. *Id.*

Once he had the license plate number, Zane reported it to the Eagle Police Department and then decided to return home rather than continue following the vehicle. Once he got home, he went over to his neighbor's home to discuss the incident. He says while he was doing that, he saw the same car drive past his home yet again.

In addition to calling the Eagle Police Department, Zane also called Kayse. When Zane's call came in, Kayse was at work but getting ready to go home. Although she had dressed down, she was still on duty and in the police station, so she passed the license plate number along to dispatch. As such, she was able to find out that evening that the license plate was registered to a person named Matthew Lee. *Ex. A to Lakey Aff.,* Dkt. 49-2, at 5. Kayse said that when she saw a picture of the registered owner of the black Honda Accord, she "had no doubt that was the man who had been lingering on my porch periodically for the past year."[1] *Id.* at 6. She also indicated that after she sent Lee's picture to her husband, he confirmed that "he was 100% sure it was the same guy he had confronted on

---

[1] Kayse did not see Lee's picture that evening, but the following day one of Kayse's colleagues in the Boise Police Department forwarded Lee's driver's license picture to her. In turn, she passed along a photo of Lee to Zane.

multiple occasions." *Id.* Finally, she indicated that on April 18, 2018 (the same day she provided her statement), she had been notified that Lee's vehicle was located at Boise Airport Chevron station. *Id.* She noted in her statement that she had started working as a relief officer at the Boise Airport beginning in April 2017. She indicated that that was "the only connection I could find between myself and my family and Matthew." *Id.* at 6.

In his written statement, Zane concluded with this: "It is overwhelming[ly] clear to me that this man is stalking my family." *See Z. Stone Dec.*, Dkt. 106, *Ex. 1 thereto.* For her part, Kayse's statement indicated that their 12-year-old daughter "is terrified of this person because of his continued stalking behaviors. He continues to come onto our property after having been trespassed and had made attempts to enter our home." Dkt. 49-2, Ex. A thereto, at 2.

## B.  Lee Dispute Parts of the Stones' Report But Does Not Dispute That Deputy Lakey Collected the Statements Before The Arrest

Lee does not dispute that he drove a Black Honda Accord during the relevant times or that he worked at the Boise Airport Chevron. Nor does he dispute that the license plate reported to the Eagle Police Department on the evening of April 16, 2018 was, in fact, his license plate number. He does not dispute that he matches the physical description the Stones reported to the officers (6'2", weighing under 200 pounds, with a bald or clean-shaven head). Finally, he does not dispute

that he was in the Stones' neighborhood from time to time—but he says this is because his then-girlfriend lived in that neighborhood. Beyond that, Lee disputes the factual narrative the Stones provided to Deputy Lakey. He says he has no idea who the Stones are, that he has never entered their property or attempted to do so, and that he did not park his car in front of the Stones' house or at their daughter's bus stop. It is, however, undisputed that Deputy Lakey had the Stones' factual statements in hand before he arrested Lee. Similarly, even assuming the Stones were not being truthful with Deputy Lakey, the undisputed facts (even viewed favorably to Lee) do not show that Deputy Lakey knew, or should have known, this to be so.

## C.  Deputy Lakey Investigates and Then Arrests Lee

On April 17, 2018—the day after Zane got a license plate number for Lee's vehicle—the matter was assigned to the Ada County Sheriff's Office "Anti-Crime Team in Our Neighborhood" (ACTION) force, under the direction of Deputy Terry Lakey, with Sergeant Patrick Schneider acting as supervisor. *See Plaintiff's Statement of Facts,* Dkt. 97-1, ¶ 5; *Lee Dec.* ¶ 4, Ex. 3 thereto. As part of his investigation, Deputy Lakey did at least the following before arresting Lee: (1) he interviewed Kayse, Lee, and Lee's mother; (2) he collected the written statements described above from Kayse and Zane; (3) he located Lee's car at a gas station near the Boise airport; and (4) he interviewed Lee's supervisor and co-worker.

Deputy Lakey kept Kayse apprised of some aspects of the investigation, and he collected information from her, as she was one of the alleged victims. But the evidence does not show that Kayse was involved in the investigation (which was being conducted by another agency, in any event) or that she was the one who decided to arrest Lee.[2] Her deposition testimony clarifies this issue at different points. For example, when asked about her role in the investigation, Kayse provided the following answer:

> A:   I'm not quite sure how to answer that. I mean, of course, I wasn't officially investigating my own case because that's inappropriate and it wasn't my jurisdiction. But I was assisting in trying to provide information to the officers or deputies that were handling the case.
>
> Q:   Would it be fair to classify you as a victim of the alleged crime?
>
> A.   I guess so.
>
> Q.    Okay. And when you say "assisting," were you assisting beyond providing information within your personal knowledge about what had happened?
>
> A.   No.

---

[2] In the briefing, as part of an argument that she was a government employee who could not be held liable unless she acted maliciously, Kayse argued that she was "at least in part acting within the course and scope of her employment in investigating and reporting an individual she had reason to believe and probable cause to pursue for committing a crime/crimes . . . ." *See Mtn. Mem.*, Dkt 93-1, at 4. But the key undisputed facts here are that Kayse was not the arresting officer; she did not direct anyone to arrest Lee; and she did not participate in the investigation other than to supply information to the officers handling the case.

*K. Stone Dep.*, Dkt. 93-2, at 44. And, in fact, Kayse was not present when Lee was arrested, and she did not make the decision to arrest him. Rather, Deputy Lakey made that decision.

## D.  Zane Stone Posts Information about Lee on NextDoor

A few days after Lee's arrest, Zane posted Lee's driver's license photo and mugshot on NextDoor, which is a social media site. The posting is in the record, and the salient points of that posting are described below, in connection with the Court's discussion of the defamation claim.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). There must be a genuine dispute as to any material fact—a fact "that may affect the outcome of the case." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

F.2d 626, 630 (9th Cir. 1987).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to a material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). In evaluating whether the moving party has met this burden, the Court must view the evidence in the light most favorable to the non-moving party and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). Once the moving party has met its burden, the non-moving party carries the burden to present evidence showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 323. The non-moving party must go beyond the pleadings and show through "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Id.* at 324.

## ANALYSIS

### A.  Defendant Kayse Stone's Motion for Summary Judgment

The Court will grant summary judgment in favor of Defendant Kayse Stone on the false-arrest claim. The parties have advanced various arguments related to this claim, but the ultimate analysis is straightforward: The claim fails because the undisputed facts show that Deputy Lakey had probable cause to arrest Lee. The Ninth Circuit has clarified that while false-arrest claims are cognizable under 42

U.S.C. § 1983, the existence of probable cause for the arrest is a complete defense. *See, e.g., Velazquez v. City of Long Beach,* 793 F.3d 1010, 1018 (9th Cir. 2015)*; Norse v. City of Santa Cruz,* 629 F.3d 966, 978 (9th Cir. 2010)*; Hart v. Parks,* 450 F.3d 1059, 1069 (9th Cir. 2006); *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001). Here, in an earlier order, the Court determined that Deputy Lakey had probable cause to arrest Lee based on the allegations in Lee's complaint. Among other things, Lee alleged that Deputy Lakey had collected factual statements from the alleged victims before arresting Lee. *See Nov. 3, 2020 Order,* Dkt. 21, at 5-11; *Aug. 4, 2021 Order,* Dkt. 46, at 4-15. The evidence submitted in connection with the summary-judgment motion does nothing to undermine the Court's earlier conclusion. To the contrary, the record evidence— even viewed in Lee's favor—strengthens the Court's earlier conclusion that Deputy Lakey had probable cause to arrest Lee. The Court will not repeat its entire analysis here, but the key legal point is that a detailed factual statement from a victim may support a finding of probable case without need of further investigation. *See, e.g., Tensley v. City of Spokane*, 267 Fed. Appx. 558, 560 (9th Cir. 2008) (citing *United States v. Butler*, 74 F.3d 916, 921 (9th Cir. 1996)) ("A detailed statement from an adult victim witness may itself suffice to establish probable cause."); *Peng v. Mei Chin Penghu*, 335 F.3d 970 (9th Cir. 2003) (concluding that a sufficiently detailed victim statement alone sufficed to establish probable cause for the arrest). *See, e.g.,*

*Ewing v. City of Stockton*, 588 F.3d 1218, 1227 (9th Cir. 2009) ("Once he has

probable cause, an office is not ordinarily required to continue to investigate or seek

further corroboration"). And the key factual point is that Deputy Lakey had not one,

but two, detailed factual statements in hand (from Kayse and Zane) before he

arrested Lee. In addition, it is undisputed that Deputy Lakey interviewed Lee, Lee's

mother, Lee's co-worker, and Lee's supervisor before he arrested Lee. Under these

circumstances, Deputy Lakey had probable cause to arrest Lee. This provides an

absolute defense to Lee's false arrest claim against Lakey and led the Court to

dismiss Lee's claim against him.

    To avoid the same result on his claim against Kayse, Lee devotes a

substantial amount of time to pointing out that Kayse was not only an alleged

victim but that she also happened to be a police officer—albeit with a different

police department than the one that employed the arresting officer. (As noted above,

the arresting officer, Deputy Lakey, was employed with the Ada County Sherriff's

Office, while Kayse was employed by the Boise Police Department.) Lee also

points out that Kayse violated Department policy by running his driver's license

information and passing along a photo of Lee to Zane. But these facts are ultimately

irrelevant because it undisputed that Kayse (1) did not arrest Lee; (2) was not

present when Lee was arrested; (3) did not direct law enforcement to arrest Lee; (4)

and did not participate in Deputy Lakey's investigation of Lee aside from providing

factual information regarding the alleged crime. And even assuming the Stones were not truthful in reporting the crime to Lakey, there are no facts supporting an inference that Deputy Lakey knew or should have known that to be so. Finally, the cases Lee relies upon in arguing that Kayse was an "integral participant" in the arrest are distinguishable. *See Response,* Dkt. 96, at 8-9 (citing various cases, as summarized in *Johnson v. Bonner Cnty.*, No. 3:18-CV-00244-DCN, 2023 WL 6690507, at *2 (D. Idaho Oct. 11, 2023)). None of those cases involved a police officer who also happened to be the alleged victim, which is the case here. Instead, those cases typically involved two or more officers working together to effect an arrest or search, and the issue was whether all officers could be viewed as being integral participants in the allegedly unlawful action. In *Johnson v. Bonner Cnty.*, No. 3:18-CV-00244-DCN, 2023 WL 6690507, at *2 (D. Idaho Oct. 11, 2023)), the Court summarized some fact patterns that have arisen within this line of cases:

> In *Blankenhorn v. City of Orange*, after finding that the use of hobble restraints on a suspect constituted excessive force, the Ninth Circuit held that an officer who handcuffed a suspect and allowed another officer to place hobble restraints on the suspect was integrally involved in the violation of the suspect's rights. 485 F.3d 463 (9th Cir. 2007). Likewise, in *Boyd [v. Benton County]*, armed officers who stood in a doorway while another officer conducted an unlawful search were found to be integral participants in the search. 374 F.3d at 773. On the other hand, in *Hopkins v. Bonvicino*, the Ninth Circuit found that an officer who stood in the yard and interviewed witnesses while other officers were conducting an unlawful search was not an integral participant in any constitutional violation later alleged. 573 F.3d 752, 770 (9th Cir. 2009).

*Johnson,* 2023 WL 6690507, at *3. The factual situation before the Court does not fall within this line of cases, as Kayse cannot properly be seen as an "integral participant" in Deputy Lakey's arrest of Lee.

To be sure, Lee may have a claim against Kayse Stone for common law false arrest or negligence. But those are not the claims before the Court. The false arrest claim here is brought under § 1983 and is therefore dependent upon a showing that Lee's federal constitutional rights were violated—specifically, his Fourth Amendment rights. The arresting officer having probable cause provides an absolute defense to any such constitutional claim. Accordingly, the Court will grant Kayse Stone's motion for summary judgment on the § 1983 false-arrest claim.

## B. Defendant Zane Stone's Motion for Summary Judgment

The Court will deny Zane Stone's motion as to the defamation claim. Lee says Zane defamed him on two separate occasions—once before he was arrested and a second time afterward.

### 1. The Pre-Arrest Communication

As for the pre-arrest statement, Lee alleges that Mr. Stone defamed him on "April 16, 2018, at approximately 8:00 P.M.," when he "contacted the Eagle Idaho Police Department to report an alleged disturbance at Zane and Kayse's

residence." *See Am. Compl.*, Dkt. 25, ¶ 8. Mr. Stone asks the Court to summarily

adjudicate this claim in his favor, but the jury will need to determine whether Mr.

Stone acted with malice when he telephoned the police on April 16, 2018, and

reported the alleged disturbance involving Mr. Lee. *See generally Berian v.*

*Berberian*, 438 P.3d 937, 948 (Idaho 2020). Mr. Stone's pre-arrest report to the

police is subject to a qualified privilege, but that privilege does not apply if the

defamatory statements was made with malice. The Idaho Supreme Court has

explained this privilege as follows:

> We hold that defamatory statements made by private individuals to
> law enforcement officials prior to the institution of criminal charges
> are entitled to a qualified privilege, not an absolute privilege, and
> this qualified privilege will not apply when the defamatory
> statements are made with malice.

*Id.* Notably, however, the sort of malice that can overcome the privilege doesn't

necessarily have to be a showing of spite or ill will toward the plaintiff. Rather, if

Mr. Stone either knew the information he reported was false, or if he recklessly

disregarded the truth in making his report, the qualified privilege does not apply.

*See generally Gardner v. Hollifield*, 533 P.2d 730, 733 n.2 (observing that one way

to "abuse" a qualified privilege is to publish defamatory material "'with express

malice . . . (i.e.) in bad faith, without belief in the truth of the matter published, or

with reckless disregard of the truth or falsity of the matter'") (quoting *Barlow v.*

*Int'l Harvester Co.*, 522 P.2d 1102, 1113 (1974)). Given that Lee disputes ever

parking his car in front of the Stone residence, a reasonable juror could conclude that Mr. Stone either knew the information he was reporting was false, or, at a minimum, that he recklessly disregarded the truth. The Court will therefore allow this aspect of the defamation claim to proceed to trial.

### 2.    The NextDoor Posting

The post-arrest statement included within the defamation claim is contained in Zane Stone's April 22, 2018 NextDoor posting. At a minimum, there is a factual dispute as to whether Mr. Stone acted negligently in publishing the information contained in that posting. The posting begins with the subject line, "**STALKER in BLACK HONDA ACCORD**." *Ex. 2 to Lee Aff.,* Dkt. 96-1. Right beneath that heading are two photos of Mr. Lee: his mugshot and his driver's license photo. *See id.* The body of the posting includes the following verbiage:

> Hi everyone, I want to inform the neighborhood about a stalker that has been following my wife and daughter. My daughter is only 13 years old . . . [T]his person has been attempting to get inside our house or figure out our garage code. . . . He had been parking in front of our house, entered onto my property, and has parked at my daughter's school bus multiple times. For the past year I have been trying to get a license plate but he has always had them covered up. He showed up again just a few days ago. I followed him and was able to get his license plate even though it was completely covered . . . .

*Id.* Mr. Stone says the Court should summarily adjudicate this aspect of the defamation claim in his favor because he was simply reporting the truth. As he puts

it, "[t]he information conveyed by Mr. Stone was not 'false' as Defendants witnessed behavior (including Plaintiff's trespass on their property) that can sufficiently constitute 'stalking.'" *Mtn. Mem.*, Dkt. 93-1, at 19. Mr. Stone goes on to argue that he reasonably believed his statements to be true because of these personal observations. *Id.* at 17. The problem, however, is that the underlying facts are disputed and on summary judgment, all reasonable inferences must be drawn in favor of the non-moving party. As already noted, Mr. Lee denies having done any of the acts the Stones say add up to stalking. As such there are disputed factual issues that preclude summary judgment on this aspect of the claim.

The Court will note, however, that there may be some complications in crafting jury instructions, because this ruling assumes Mr. Lee must prove Mr. Stone acted negligently. But that point is not entirely clear, given the Idaho Supreme Court's jurisprudence on the elements of defamation. In dozens of cases, the Idaho Supreme Court has recited the elements as having the following three elements: (1) Defendant communicated information concerning the plaintiff to others; (2) the information was defamatory; and (3) plaintiff was damaged because of the communication. *See, e.g., Davis & George & Jesse's Les Schwab Tire Store, Inc.*, 541 P.3d 667, 674 (Idaho 2023). The Idaho Supreme Court has also repeatedly noted that additional elements must be proven *if* the publication concerns a public official, a public figure, or matters of public concern. Over the

years, the court has explained it this way:

> As a fourth element, when a publication concerns a public official, public figure, or matters of public concern and there is a media defendant, the plaintiff must also show the falsity of the statements at issue in order to prevail in a defamation suit. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775–76 (1986). Finally, if the plaintiff is a public figure, the *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), standard applies, and the plaintiff can recover only if he can prove actual malice, knowledge of falsity or reckless disregard of truth, by clear and convincing evidence.

*Clark v. The Spokesman-Review*, 163 P.3d 216, 219 (Idaho 2007).

By implication, then, a private-figure plaintiff such as Mr. Lee who is suing a non-media defendant regarding a matter of private concern wouldn't have to prove defendant acted with any particular mental state.

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Supreme Court held that states cannot allow a private-figure plaintiff to prevail in a defamation claim *against a media defendant* without making a showing of *some* level of fault. *Id.* at 347. But states were left to define for themselves the appropriate standard of fault. *Id.* Significantly, *Gertz* did not announce a federal rule for fault in a defamation case brought by a private-figure plaintiff against a nonmedia defendant. And that brings us back to the three elements recited above. It would appear, based on that formulation, that Idaho plaintiffs don't have to prove any particular mental state to succeed on a defamation claim. But confusion comes in because of Idaho's pattern jury instructions, which the Idaho Supreme Court recommends for use in Idaho

trial courts. Those instructions suggest that in all cases of "general" defamation, the plaintiff must prove that the defendant acted negligently, in that the instruction requires the plaintiff to prove that the defendant either knew, or reasonably should have known, that the published statement was false.[3] Jury instructions are not pronouncements of law from the Idaho appellate courts, so the instruction. in and of itself, doesn't bindingly speak to the elements of the tort. But in a 2020 decision—*Siercke v. Siercke*, 476 P.3d 376 (Idaho 2020)—the Idaho Supreme Court quoted from that very instruction, which would seem to mean the pattern jury instructions correctly set out the elements of the tort. But *Siercke* didn't directly opine as to the proper elements of defamation. It was dealing with a waiver issue and only quoted the instruction in that context. *See id.* at 716-17. And even

---

[3] The relevant pattern jury instruction, No. 4.82, provides as follows:

> In order to prove a claim of defamation, the plaintiff has the burden of proving each of the following elements:
>
> (1)     The defendant communicated information concerning the plaintiff to others; and
> (2)     The information impugned the honesty, integrity, virtue or reputation of the plaintiff or exposed the plaintiff to public hatred, contempt or ridicule; and
> (3)     The information was false; and
> (4)     **The defendant knew it was false, or reasonably should have known that it was false;** and
> (5)     The plaintiff suffered actual injury because of the defamation; and
> (6)     The amount of damages suffered by the plaintiff.

Idaho Civil Pattern Jury Instruction 4.82 (emphasis added).

though the *Sierke* Court assumed without deciding that the pattern jury instruction was correct, it never came right out and said that. (Notably, the *Siercke* trial court apparently used the three-element formulation laid out above. *See* 476 P.3d at 384 (observing that "the jury was instructed as to only the first three elements of defamation")). Further, in a later case, the Idaho Supreme Court once again recited the elements of the defamation tort precisely as shown above—that is, showing only the three elements. *See Davis,* 541 P.3d at 674. That, of course, once again suggests that there is no fault requirement for a private-figure plaintiff suing a non-media defendant. And in reciting the elements of the tort, the 2023 Idaho Supreme Court decision cited its earlier, 2020 *Siercke* decision as support. *Id.* (Adding to the confusion, the three cases cited in the commentary section of the relevant Idaho pattern jury instruction aren't defamation cases.[4])

At the end of the day, then, it's not clear if Mr. Lee will be required to prove that Mr. Stone acted negligently. But at this point in the proceedings, based on the

---

[4] The pattern jury instruction cites three cases—without any accompanying commentary—in support of the elements laid out in the body of the instruction. The cited cases, however, all deal with the tort of conversion; they don't even mention defamation. *See Carver v. Ketchum*, 26 P.2d 139 (Idaho 1933); *Klam v. Koppel*, 118 P.2d 729 (Idaho 1941); *Adair v. Freeman*, 451 P.2d 519 (Idaho 1969). The Court checked Idaho's pattern instruction for conversion (No. 4.50), thinking perhaps there was a mix-up, and that it would find defamation cases there. But the conversion instruction cites the three cases just noted (*Carver*, *Klam*, and *Adair*). Accordingly, from what this Court can tell, there is no Idaho case authority directly supporting the formulation of the tort laid out in the pattern instruction.

undisputed facts before the Court, and even interpreting the law most favorably to the defense, the jury would still have to decide whether Mr. Stone acted negligently in determining whether the information he published on NextDoor was false. Accordingly, the Court will deny Mr. Stone's motion for summary judgment defamation claim.

## C.  The Motion to Seal

Lee filed a motion to seal in connection with his motion for summary judgment. But he did so based only on the fact that the parties had marked the documents as confidential during discovery. He further stated that he "anticipates filing a motion shortly to unseal these documents, in that there appears to be no basis for the documents to remain confidential." *Motion,* Dkt. 97, at 1-2. Under these circumstances, the Court will deny the motion to seal without prejudice to any party filing a motion to seal the documents. The Clerk will be directed to keep the filing under seal for 30 days, which will allow any party to file a motion to seal. If no such motion is filed, the filing will be unsealed, without any further order of the Court.

## ORDER

**IT IS ORDERED that** Defendants Kayse and Zane Stone's Motion for Summary Judgment (Dkt. 93) is granted in part and denied in part as follows:

(1) Defendant Kayse Stone's motion for summary judgment of Plaintiff's

third claim for relief, for violation of his Fourth Amendment rights, is **GRANTED.**

(2) Defendant Zane Stone's motion for summary judgment of Plaintiff's fifth claim for relief for defamation is **DENIED.**

(3) Plaintiff's Motion to Seal (Dkt. 97) is **DENIED WITHOUT PREJUDICE.** The Clerk is directed to unseal the filing at Dkt. 97 no sooner than 30 days from the date of this order. If, within those 30 days, any party files a motion to seal, the Clerk is directed to leave the filing at Dkt. 97 under seal unless and until the Court orders otherwise.

DATED: May 3, 2024

B. Lynn Winmill
U.S. District Court Judge